UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KERRY WHITE BROWN, D.D.S.,                    CIVIL ACTION
P.C., ET AL.

VERSUS                                         NO: 06-2938

OCA, INC., ET AL.                              SECTION: R(3)

**ORDER AND REASONS**

Before the Court is plaintiffs' Motion for Summary Judgment.
For the following reasons, the Court GRANTS the motion.

**I.    Background**

**A.    Factual Background**

This matter arises out of a business relationship between a
private orthodontic practice, Kerry White Brown, D.D.S., P.C.
(White Brown), and its provider of business, financial, and
office management services, Orthodontic Centers of America, Inc.
(OCA).  OCA operates through a network of wholly owned
subsidiaries named according to the states in which OCA does

business (*e.g.*, Orthodontic Centers of South Carolina, Inc.). Through its subsidiaries, OCA entered into long-term business service agreements (BSAs) with doctors in about 250 practices nationwide to provide office management and patient billing support, among other services.  Under the BSAs, the doctors pay OCA a monthly fee based upon a percentage of their operating profit or practice revenue.  The BSAs are OCA's primary asset and the source of nearly all of its revenue.

**B.   Business Service Agreement**

In 1998, Dr. Kerry White Brown, an orthodontist with offices in South Carolina, entered into a BSA with OCA. (R. Doc. 40-4). OCA agreed to provide a range of office and business services under the BSA in exchange for what the BSA designates as a "service fee."  Essentially, the arrangement was for OCA to take care of business functions so that the doctors could practice medicine free of administrative hassles.  OCA was responsible for: (i) employment, recruiting and training of the office staff; (ii) scheduling of the office staff; (iii) recruitment of orthodontists, as requested by White Brown; (iv) payroll administration and accounting services for the staff; (v) negotiation of primary leases for the offices; (vi) construction of leasehold improvements; (vii) acquisition, upkeep and maintenance of furniture and equipment; (viii) arranging for

2

telephones and utilities for the offices; (ix) installation of computer hardware and software, and computer training; (x) ordering and managing center supplies and inventory; (xi) financial services; (xii) establishment of administrative controls to assure against theft; (xiii) laboratory services; (xiv) marketing and advertising; (xv) preparation of statistical data and analyses of practice operations; (xvi) legal services for the practice's routine operations; and (xvii) consulting advice on practice efficiency and productivity, marketing, office locations and layouts, and staff salaries, benefits and performance and incentive plans.  (BSA at ¶1.1).  OCA held control over the practice's orthodontic revenues and exclusively controlled the disbursement of funds from its bank account. (BSA at ¶1.10).  OCA owned White Brown's office equipment and furnishings and leased these items to White Brown. (BSA at ¶1.4). The BSA, however, provided that the office equipment and furnishings were to be under the "exclusive control" of White Brown. (BSA at ¶1.4).  OCA also controlled the office lease and subleased the premises to White Brown. (BSA at ¶1.5).  OCA had a duty to consult with White Brown on all of the services it provided. (BSA at ¶1.3).

In the BSA, both parties agreed to covenants not to compete. (BSA at ¶¶ 5.1-5.2).  The BSA was to last for a term of 25 years.

3

(BSA at ¶4.1).  The BSA also contained a choice of law provision which stated that the laws of South Carolina shall govern the validity and interpretation of the agreement. (BSA at ¶8.5).

**C.   Service fee arrangement**

Under the BSA, White Brown agreed to pay a monthly fee to OCA according to a detailed formula. (BSA at ¶3.1).  White Brown agreed to pay OCA the difference between Patient Revenue and 60% of the Net Operating Margin. (BSA at ¶3.1(a)).  "Patient Revenue" is defined as 24.12% of the aggregate total balance of all fees and charges paid by patients, plus a portion of each patient contract. (BSA at ¶3.1(b)(ii)).  The "Net Operating Margin" means the difference between the total amount of cash and cash equivalents of Patient Revenue collected and the sum of the Center Expenses and Amortized Acquisition Costs. (BSA at ¶3.1(b)(i)).  "Amortized Acquisition Costs" means an amount equal to 60% of the total cost incurred by OCA in acquiring furniture and equipment and leasehold improvements, amortized over a 60-month period from the date of disbursement of the costs. (BSA at ¶3.1(b)(iii)). "Center Expenses" include the practice's business expenses as well as some of OCA's corporate overhead. (BSA at ¶3.2).

**D.   Procedural Background**

On March 14, 2006, OCA and its subsidiaries filed for

4

bankruptcy.  On May 20, 2006, the plaintiffs sued OCA seeking declaratory relief and damages for breach of contract and breach of fiduciary duty. (No. 06-10179 (B), R. Doc. 1).  OCA counterclaimed, seeking declaratory relief that the contract was valid, and damages for breach of contract, promissory estoppel, conversion, unjust enrichment, and quantum meruit. (R. Doc. 59 and No. 06-10179 (B), R. Doc. 31).  On November 5, 2007, after discovery was completed in the Bankruptcy Court, the Court issued an Order withdrawing the reference to the Bankruptcy Court. (R. Doc. 36).  On April 15, 2008, White Brown moved for summary judgment on the issue of whether the BSA is invalid and unenforceable under South Carolina law. (R. Doc. 40).

## II.  Legal Standard

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).  A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990) (citing

5

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)).  The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex,* 477 U.S. at 325; *Lavespere,* 910 F.2d at 178.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex,* 477 U.S. at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).

**III. Discussion**

    **A.   The invalidity of the BSA under South Carolina common law**

South Carolina has a common law prohibition against the corporate practice of medicine. *See Baird v. Charleston County*, 511 S.E. 2d 69, 78 (S.C. 1999); *McMillan v. Durant*, 439 S.E. 2d

6

829, 831 n.2 (S.C. 1993); *Wardsworth v. McRae Drug Co.*, 28 S.E.

2d 417, 419 (S.C. 1943); *Ezell v. Ritholz*, 198 S.E. 419, 424

(S.C. 1938).  The prohibition is premised on the idea that if

professions were commercialized, professional standards and

ethics would be undermined by commercial interests. *See Ezell*,

198 S.E. at 424.  In *Ezell,* the South Carolina Supreme Court

explained:

> If such a course were sanctioned the logical result
> would be that corporations and business partnerships
> might practice law, medicine, dentistry or any other
> profession by the simple expedient of employing
> licensed agents.  And if this were permitted
> professional standards would be practically destroyed,
> and professions requiring special training would be
> commercialized, to the public detriment.  The ethics of
> any profession is based upon personal or individual
> responsibility.  One who practices a profession is
> responsible directly to his patient or his client.
> Hence he cannot properly act in the practice of his
> vocation as an agent of a corporation or business
> partnership whose interests in the very nature of the
> case are commercial in character.

*Ezell*, 198 S.E. at 424.

South Carolina's Dental Practices Act, S.C. Code. Ann. § 40-

14-10, *et seq.*, regulates the practice of dentistry in the state.

The Dental Practices Act does not authorize the corporate

practice of dentistry. *See* 1984 S.C. Op. Att'y Gen. 80, 1984 WL

159844 (1984).  The Act, however, does not explicitly prohibit it

either.  Still, South Carolina jurisprudence post-dating the Act

holds that a corporation cannot engage in the practice of a learned profession. See *Baird*, 511 S.E. 2d at 78.

While there is little case law on the issue, a South Carolina Attorney General opinion outlines several factors to consider in determining whether a medical professional is subject to the direction and control of a corporation. *See* S.C. Op. Att'y Gen., 1982 WL 189119 (1982).  If the corporation and professional have an employer/employee relationship, the corporation is unlawfully engaged in the practice of that profession. *Id.*  The opinion states that courts often look to whether the corporation maintains the office of the practitioner, owns the equipment utilized, pays the operating expenses, and receives the fees or a major portion of the fees submitted to the practitioner. *Id.*  The opinion further states that usually in these unlawful practices, the unlicensed corporate officials determine the corporate policies that govern the practice. *Id.*  The opinion also states that courts must often look "beyond the face of the agreement" in evaluating whether the arrangement allows the corporation to practice without a license. *Id.*

Under South Carolina law, if the terms within a contract are plain and unambiguous, the construction of the contract is a question of law that may be resolved on summary judgment. *HK New*

8

*Plan Exchange Property Owner I, LLC v. Coker*, 649 S.E. 2d 181,
184 (S.C. Ct. App. 2007).  Here, the Court finds that the terms
of the BSA are unambiguous and violate the common law prohibition
on the corporate practice of dentistry.  The contract subjects
White Brown to the "direction and control" of OCA.  OCA
effectively had an ownership interest in and maintained and
operated the orthodontic practice of Dr. White Brown.  Under the
BSA, OCA was responsible for employing and training office staff,
providing and maintaining office space, marketing and
advertising, and administering the practice's payroll. (BSA at
¶1.1).  OCA handled all bookkeeping and financial tasks for the
practice and controlled the practice's bank account. (BSA at
¶¶1.8-1.9).  OCA controlled the disbursement of any sums White
Brown was entitled to withdraw from the bank account. (BSA at
¶3.4).  OCA required the practice to be open during certain times
each week and one Saturday each month. (BSA at ¶2.3(c)).  It
required the staff to keep a dress code consistent with its
guidelines (BSA at ¶2.3(d)) and utilize its computer systems (BSA
at ¶2.3(e)).  Further, under the BSA, OCA controlled the leases
of the practice's offices and owned the office equipment. (BSA at
¶¶1.4-1.5).  OCA also arranged for all leasehold improvements to
the office. (BSA at ¶1.6).

More importantly, OCA was substantially involved in

9

decisions concerning the practice's expansion into new offices and the addition of new orthodontists.  White Brown had to consult with OCA as to the development of any new office, and any new office was automatically subject to the BSA. (BSA at ¶5.6). White Brown similarly had to consult with OCA as to the purchase of any existing orthodontic practices, and those practices were also automatically subject to the BSA. (BSA at ¶5.7).  White Brown was also required to consult with OCA on the need to hire associate orthodontists. (BSA at ¶5.8).  The BSA prevented White Brown from hiring associate orthodontists unless White Brown sold the associate an ownership interest in the practice after a reasonable test period. (BSA at ¶5.8).  For all of the foregoing reasons, OCA had an extensive degree of control over White Brown's practice.

Additionally, although OCA claims that it merely received a "service fee for providing non-clinical business and administrative services and for leasing the furniture," OCA and Dr. White Brown were essentially sharing profits.  OCA's service fee was the difference between the practice's patient revenue and 60% of the net operating margin. (BSA at ¶3.1).  Thus both parties shared the operating expenses and the practice's profits and losses.  Since this business arrangement gave OCA a high degree of control over the practice's operations and a beneficial

interest in the practice's profits, there was a risk that OCA could influence and interfere with Dr. White Brown's professional judgment.  Under such an arrangement, Dr. White Brown could feel responsible to OCA, rather than her patients. *See Ezell*, 198 S.E. at 424 (noting that "[o]ne who practices a profession is responsible directly to his patient" and cannot act "as an agent of a corporation or business partnership whose interests in the very nature of the case are commercial in character.").  Such an arrangement violates South Carolina's prohibition on the corporate practice of dentistry.

That the BSA expressly provided that OCA does not practice dentistry does not alter this conclusion. (BSA at ¶1.2).  Neither does the fact that the BSA describes the orthodontist as an independent contractor. (BSA at ¶5.9).  The Court must "look beyond the face of the agreement to determine whether in reality the corporation was practicing without a license." *See* S.C. Op. Att'y Gen., 1982 WL 189119 (1982).  Given OCA's control over so many aspects of White Brown's practice, OCA was "in reality" practicing dentistry without a license.  The self-serving disclaimers do not change the actual arrangement.

**B.   The invalidity of the BSA under South Carolina's professional corporation statute**

Neither party disputes that a partnership between White Brown and OCA would be illegal.  Under South Carolina law, domestic professional corporations may be organized "solely for the rendering of professional services, including services ancillary to them, within a single profession." S.C. Code. Ann. § 33-19-110.  Professional corporations may issue shares only to:

(1) individuals who are authorized by law in this or another state to render a professional service described in the corporation's articles of incorporation;

(2) general partnerships in which all the partners are qualified persons with respect to the professional corporation and in which at least one partner is authorized by law in this state to render a professional service described in the corporation's articles of incorporation;

(3) professional corporations, domestic or foreign, authorized by law in this State to render a professional service described in the corporation's articles of incorporation.

S.C. Code. Ann. § 33-19-200.  Accordingly, only licensed dentists may own a share in a dental partnership.  It is undisputed that OCA does not fall within one of the categories outlined by the statute.  Therefore, if OCA and White Brown are partners, as White Brown contends, their business arrangement violates Section 33-19-200.

South Carolina law provides "[a] 'partnership' is an association of two or more persons to carry on as co-owners of a business for profit." S.C. Code. Ann. § 33-41-210.  A partnership agreement "may be implied and without express intention." *Halbersberg v. Berry*, 394 S.E. 2d 7, 10 (S.C. Ct. App. 1990). The intention of the parties is one of the most important tests of partnership. *Moore v. Moore*, 599 S.E. 2d 467, 477 (S.C. Ct. App. 2004) (quoting *Stephens v. Stephens*, 50 S.E. 2d 577, 579 (S.C. 1948)).  But even if parties do not intend to create a partnership, "when all of the conditions exist which by law create a legal relationship, the effects flowing legally from such relation follow whether the parties foresaw and intended them or not." *Moore*, 599 S.E. 2d at 477 (citing *Stephens,* 50 S.E. 2d at 580).  In ascertaining whether a partnership exists, South Carolina courts look to the following factors: (1) the sharing of profits and losses; (2) community of interest in capital or property; and (3) community of interest in control and management. *Moore*, 599 S.E. 2d at 477 (citing *Halbersberg*, 394 S.E. 2d at 10).  The sharing of profits is *prima facie* evidence of partnership unless the profits were received in payment:

(a) as a debt by installments or otherwise,

(b) as wages of an employee or rent to a landlord,

13

(c) as an annuity to a widow or representative of a
deceased partner,

(d) as interest on a loan, though the amount of payment
var[ies] with the profits of the business or

(e) as the consideration for the sale of the good will
of a business or other property by installments or
otherwise.

S.C. Code. Ann. § 33-41-220.  The South Carolina Supreme Court
has held that evidence that appellant shared profits, rendered
business advice, resolved employee problems and signed documents
supported a finding that a partnership existed. *See Orders
Distributing Co., Inc. v. Newsome Carpets & Wallcovering*, 418
S.E. 2d 550, 552 (1992).  Similarly, in *Halbersberg*, another
South Carolina court held that evidence that defendant not only
shared in profits and losses, but also kept the books and shared
in management decisions, was sufficient to establish a
partnership in a t-shirt business. *Halbersberg*, 394 S.E. 2d at
10.

The Court finds that the BSA creates an illegal partnership
between OCA and White Brown.  As discussed, *supra*, the BSA
created a profit-sharing arrangement between White Brown and OCA.
Profit-sharing is *prima facie* evidence of partnership. *See*
Section 33-41-220.  OCA's and White Brown's shared interest in

14

the control and management of the practice also reflects that the arrangement was a partnership. *See supra*.  Like the defendant in *Halbersberg*, OCA kept the practice's books (BSA at ¶1.8) and participated in management decisions, such as setting the practice's hours and the staff dress code. (BSA at ¶2.2(c)-(d)). OCA also rendered business advice (BSA at ¶1.1), employed office staff (BSA at ¶1.7), and signed documents on behalf of the practice. (BSA at ¶1.10).  OCA had numerous other managerial responsibilities under the BSA, as discussed *supra*. (BSA at ¶1.1).  Accordingly, as OCA shared both profits and management responsibilities with the practice, the arrangement under the BSA establishes a partnership with a professional corporation in violation of Section 33-19-200.

### C.    Severability and enforceability

Further, the illegality of these contract provisions cannot be severed from the other provisions of the BSA.  The BSA contains a clause providing that if a provision of the agreement is held to be illegal, then it shall be severed from the agreement, leaving the remainder effective and binding upon the parties. (*See* BSA at ¶8.8).  Under South Carolina law, whether an illegal provision of a contract may be severed turns on the intent of the parties. *See Beach Co. v. Twillman, Ltd.*, 566 S.E.

2d 863, 867 (S.C. Ct. App. 2002).  "A contract is entire, and not severable, when by its terms, nature, and purpose it contemplates and intends that each and all of its parts, material provisions, and the consideration are common each to the other and interdependent." *Id.* (quoting *Columbia Architectural Group, Inc. v. Barker*, 266 S.E. 2d 428, 429 (S.C. 1980)).  Here, the contractual provisions are interdependent and not severable.  As OCA effectively owned, operated, and managed White Brown, the nature of the business arrangement itself is illegal under South Carolina law, in that it allows OCA to engage in the corporate practice of dentistry.  Accordingly, as the very purpose of the BSA is void, the agreement cannot be reformed.

Under South Carolina law, a party may not enforce an illegal contract. *See Beach Co.*, 566 S.E. at 866.  Claims that derive solely form an illegal agreement are unenforceable. *See Jackson v. Bi-lo Stores, Inc.*, 437 S.E. 2d 168, 171 (S.C. Ct. App. 1993). Here, OCA brought claims of declaratory relief as to the validity of the contract, breach of contract, promissory estoppel, conversion of the dental equipment OCA owned, unjust enrichment, and quantum meruit.  All of these claims are premised on the parties' illegal relationship created under the BSA and are thus unenforceable.  Similarly, White Brown's claims for breach of contract and breach of fiduciary duty are also unenforceable.

16

Accordingly, the Court will leave the parties where it found them.


**IV.  Conclusion**

For the foregoing reasons, the Court GRANTS plaintiffs' Motion for Summary Judgment.


New Orleans, Louisiana, this <u>30th</u> day of October, 2008

_Sarah Vance_
_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE